Scott Alan George
**SEEGER WEISS LLP**
550 Broad Street; Suite 920
Newark, NJ 07102
Tel:  (973) 639-9100
Fax:  (973) 639-9393
sgeorge@seegerweiss.com

*See Signature Line for Additional Counsel*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

————————————————————

| | |
|---|---|
| STEVEN HODGES on behalf of<br>Himself and all others similarly situated, ) | **CLASS ACTION COMPLAINT** |
| ) | |
| Plaintiff,                       ) | **Civ. Action No. _____** |
| ) | |
| v.                                ) | |
| ) | |
| VITAMIN SHOPPE INC.,      ) | JURY TRIAL DEMANDED |
| ) | |
| ) | |
| Defendant.              ) | |

————————————————————

Plaintiff Steven Hodges ("Plaintiff"), by and through his undersigned counsel, on behalf of himself and all other persons similarly situated, alleges the following facts and claims upon knowledge as to matters relating to himself and upon information and belief as to all other matters and, by way of this Complaint, avers as follows:

## INTRODUCTION AND SUMMARY OF ACTION

1.     This is a civil class action brought individually by Plaintiff and on behalf of a class of persons similarly situated, ("Class Members"), who purchased the dietary supplement True Athlete Training Formula ("Product") from Defendant.  While Defendant makes certain claims in the labeling and advertising of the Product as a bodybuilding, fitness training and

endurance developing formula, none of the ingredients themselves or as formulated by Defendant will deliver the results Defendant promises.

2.      Defendant Vitamin Shoppe, Inc., advertises, manufactures, markets, sells and distributes the Product which is sold in the growing and extremely competitive fitness industry as a "Pre-Workout Muscle Building and Performance Enhancing" product.  Although Defendant boasts about the Product's efficacy in labeling and advertising the Product (*see e.g.* Exhibits A and B as well as Defendant's websiteswww.vitmainshoppe.com and www.true-athlete.com.), it dramatically under-doses and uses ineffective compounds such that none of the promised benefits is or can be delivered by the Product.

3.      As a result of Defendant's unfair, deceptive, fraudulent, unfair and misleading practices, Plaintiff and Class Members have been unfairly deceived into purchasing the Product which they would not otherwise have purchased, or would have purchased only at a substantially lower price than that charged by Defendant.

4.      Accordingly, Plaintiff brings this action seeking damages and other relief from Defendant for its violations of the New Jersey Consumer Fraud Act, for its breaches of express and implied warranties, and for its unjust enrichment at the expense of Plaintiff and the class.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and this is a class action in which Plaintiffs and other Class members and Defendant are citizens of different states..

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391, *et seq.* because a substantial part of the events or omissions giving rise to this claim occurred in the state of New

Jersey.  Additionally, venue is appropriate for the claims arising out of New Jersey's Consumer Fraud Act because the statute applies to any company engaging in any of the activities regulated by the Act within the State of New Jersey.

## THE PARTIES

7.     Plaintiff Steven Hodges at all relevant times hereto, has been a citizen and resident of Los Angeles, California.

8.      Plaintiff purchased the Product on Defendant's website www.vitaminshoppe.com on or about December 2, 2012, for his own use, and not for resale prior to purchasing the Product, Plaintiff read and relied on Defendant's misrepresentations as set forth herein.

9.     Vitamin Shoppe, Inc. is a New Jersey corporation headquartered at 2101 91st Street, North Bergen, New Jersey.

## COMMON FACTUAL ALLEGATIONS

10.     Vitamin Shoppe is a retailer of nutritional products and sports supplements as well as herbs, homeopathic remedies, and beauty aids.  The company currently sells its products through the internet and more than 500 stores located in 38 states and Puerto Rico.

11.     One of its mainstays is the Product at issue in this litigation, which is one of its leading sports supplements.  Defendant has sold thousands of units of the Product either on its website or through its retail outlets throughout the United States.

12.     Defendant does not mince words on the label of the Product about what the Product will deliver to Defendant's customers, so-called "True Athletes":

TRUE ATHLETE
NATURALLY DRIVEN
*Serious muscle, endurance and performance support. That's what you get with True Athlete Training Formula. No filler. No fluff. No hype. Just the primary active ingredients needed to give you the advanced pre-workout support you want. Developed with the*

*athlete and fitness enthusiast in mind*, True Athlete Training Formula contains the important base nutrients creatine, arginine and beta alanine, as well as AstraGin, a proprietary nutrient uptake enhancer. This ™ed ingredient is produced from ginseng and astragalus and has been shown to improve absorption of amino acids, glucose, vitamins and other nutrients over placebo. This streamlined formula can be customized to meet your athletic and fitness needs . . . .

**Directions**
 As a dietary supplement, take 1 to 3 scoops prior to training or activity.

*See* Exhibit "B" (added emphases in italics)

13.     Expanding on the statements Defendant makes right on each container of the

Product, Defendant develops further on the trust its customers must place in Defendant when

using its Product and the virtues of Defendant and its Product in other marketing materials,

including its websitehttp://true-athlete.com/product-trainingformula.html:

**TRAINING FORMULA**
*Developed with the athlete and fitness enthusiast in mind, True Athlete® Training Formula contains the important base nutrients* creatine, arginine and beta alanine, as well as AstraGin®, a proprietary nutrient uptake enhancer. This trademarked ingredient is produced from ginseng and astragalus and has been shown to improve absorption of amino acids, glucose, vitamins and other nutrients over placebo. This streamlined formula can be customized to meet your athletic and fitness needs.

- **BODYBUILDING**: COMBINE TRAINING FORMULA WITH PROTEIN OR AMINO ACIDS FOR ADDED MUSCLE SUPPORT
- **FITNESS/SPORTS TRAINING**: FOR ADDED ENERGY AND RECOVERY SUPPORT, COMBINE TRAINING FORMULA WITH AMINO ACIDS AND/OR NATURAL FRUIT JUICE
- **ENDURANCE**: CAN BE TAKEN WITH ELECTROLYTES OR ADDED TO YOUR FAVORITE SPORTS BEVERAGE

*       *       *       *

**The True Athlete® Story**
**THE MISSION**
**EMPOWER & INSPIRE**

**EMPOWER**: *The True Athlete® mission is to empower athletes and fitness enthusiasts who crave performance, quality and integrity. We are inspired by the Olympic mindset.* If you win naturally, it means more. It's about competing against yourself to achieve your personal best.

**THE PHILOSOPHY**
**TRUE ATHLETE® EMBRACES 5 CORE TRUTHS**:
1. Compete with honor
2. Commit to the journey
3. Dedicate yourself to your regimen
4. Empower individual achievement
5. Focus your mind to power your body

**THE FORMULA**
*Purity of intent led to purity in formulation. We developed a revolutionary line of sports nutrition* that athletes and fitness enthusiasts would embrace with no artificial colors, flavors, sweeteners or bovine growth hormones in any of our products. We next embarked upon a partnership with the NSF to make sure that EVERY SINGLE TRUE ATHLETE™ PRODUCT is free of banned substances, unlisted ingredients or harmful impurities. THE FIRST AND ONLY COMPLETE LINE OF SPORTS NUTRITION PRODUCTS TO BE CERTIFIED FOR SPORT® BY THE NSF® IDEAL FOR COLLEGE AND SCHOLASTIC ATHLETES, PRO ATHLETES AND FITNESS ENTHUSIASTS

\*        \*        \*        \*

**TRUE ATHLETE®**
The first and only complete line of sports nutrition supplements to be NSF® Certified for Sport® by the NSF®, which means that it's free of banned substances, unlisted ingredients and harmful impurities.

*COMPETE LIKE A PRO*
*Many athletes in professional leagues like the NFL, MLB, PGA and LPGA use nutritional and performance supplements that are NSF® Certified for Sport®.* This helps them to ensure that they are consuming products that are free of banned substances and competing ethically. *True Athlete® makes this same level of quality and purity available to you.*

(added emphases in italics) (*see also Exhibit A*)

14.    Defendant's claims about its intentions, its formulations and the Product are false.

Any comparison of the efficacy of the Product to those used by professional athletes is false.

Any claim that the Product is effective when used per Defendant's directions to build muscle

mass, increase strength, build endurance, or to realize any of the other benefits promised as part of the Product is false.  Rather, in a long American tradition, Defendant sells the notion and story of health without seeing clear to deliver the goods.

15.     Defendant strategically chose to include the active ingredients in the Product due to their widespread name recognition within the sports supplement market.  However, Defendant drastically under-doses these compounds to profit from the name recognition and efficacy claims associated with them, while dramatically increasing their profit margin by under-dosing the ingredients, making them all but useless.

16.     Review of the formulation of active ingredients shows that Defendant has not told the truth about its Product:

## Supplement Facts

Serving Size 1 Scoop (2.9 g)
Servings Per Container 90

| | Amount Per Serving | % Daily Value |
|---|---|---|
| Creatine Monohydrate | 1 g | * |
| Arginine AKG | 1 g | * |
| Beta Alanine (CarnoSyn®) | 500 mg | * |
| AstraGin™ (proprietary blend) Ginseng (Panax ginseng) (root) and Astragalus membranaceous (root) | 17 mg | * |

* Daily Value not established.

**Other ingredients:** Stevia.

NO   Yeast, Corn, Wheat, Gluten, Sugar, Salt, Soy, Dairy, Citrus, Fish, Animal Derivatives, Preservatives, Artificial Colors or Flavors Added.

17.     Defendant uses an ingredient, L-Arginine Alpha Ketoglutarate ("AAKG"), known to be useless for increasing nitric oxide production in the body, enhancing athletic performance, improving cardiovascular function, or building muscle. Indeed, it might as well sell sugar pills along with its promises.

18.     While the remaining ingredients may, in proper doses and in the appropriate

conditions, nominally offer some of the claimed benefits, Defendant knowingly under-doses

these remaining active ingredients: Creatine Monohydrate ("CM"), Beta-Alanine (as

Carnosyn®), and AstraGin™.  In other words, Defendant formulates the Product only to give the

appearance that their efficacy claims may have merit when, in fact, these claims are empty.

### I.     L-Arginine Alpha Ketoglutarate ("AAKG")

19.     Defendant's Product contains AAKG which is falsely marketed by Defendant as a

muscle building, endurance and athletic performance enhancing compound.

20.     The Product contains 1 gram of AAKG per serving.  The Defendant directs the

consumer to "take 1 to 3 scoops prior to training or activity".

21.     Numerous manufacturers of sports supplements falsely claim this compound

provides increased muscle strength, muscle mass, stamina, improved cardiovascular function, by

boosting Nitric Oxide levels, increasing vasodilation and extending muscle "pumps."  Aside

from these misperceptions, there are no other mechanisms that could justify any such claims of

efficacy.

22.     However, there is a wealth of scientific studies not only refuting the AAKG

claims of nitric oxide production and vasodilation, but also specific clinical studies refuting the

claims that AAKG can directly increase muscle mass, strength, endurance and athletic

performance.

### A.  AAKG Effects on Nitric Oxide Production and Vasodilation

23.     "Muscle Pumps" refers to increased blood flow to the muscles, which in turn is

supposed to increase the size of the muscles.

24.     Nitric oxide is a gaseous signalling molecule known to contribute to the control of

vascular tone, and is considered to play a role in the vasodilatation of muscle resistance vessels during exercise.

25.     L-arginine (2-amino-5-guanidino-pentanoic acid) is a conditionally-essential, proteinogenic amino acid and a natural constituent of dietary proteins.

26.     Arginine alpha-ketoglutarate (AAKG) is a salt of the amino acid arginine.

27.     L-arginine/AAKG-enhanced vasodilation and blood flow to working muscles during resistance exercise is alleged to provide an even greater impetus for increasing muscle strength and hypertrophy than exercise alone.

28.     AAKG supplementation has been shown not to increase muscle blood flow after resistance training, thus providing no increase in size to the muscles trained[1].

29.     Presently, there are several studies involving an L-arginine/AAKG-based approach to increase circulating nitric oxide in humans; however, none of the studies have demonstrated any positive results that would justify the claims made by Defendant.

30.     A number of studies have been conducted on L-arginine/AAKG and L-arginine/AAKG-containing supplements to assess the effectiveness in which they increase the levels of nitric oxide in the blood.

31.     It should be noted that nitric oxide is very difficult to measure in circulation due to its relative instability and short half-life.  Therefore, the metabolites nitrate and nitrite (NOX) are most often measured.

---

[1]*See* Tang J, Lysecki P, Manolakos J, Tarnopolsky M, Phillips S. Bolus arginine supplementation affects neither muscle blood flow nor muscle protein synthesis in young men at rest or after resistance exercise. *Journal of Nutrition*, 141:195-200, 2011; *see also*Willoughby DS, Boucher T, Reid J, Skelton G, Clark M. Effects of 7 days of arginine-alpha-ketoglutarate supplementation on blood flow, plasma L-arginine, nitric oxide metabolites, and asymmetric dimethyl arginine after resistance exercise. *International Journal of Sport Nutrition and Exercise Metabolism,* 21:291-99, 2011.

32.     The available published data on this issue has clearly indicated that these so-called nitric oxide inducing supplements which contain L-arginine are ineffective in inducing increases in circulating nitric oxide.

33.     For example, a single oral dose of L-arginine provided at 0.1 gram/kg was in effective at increasing NOX in the blood[2].

34.     L-arginine provided orally at 6 g/day for three days was shown to have no effect on plasma NOX metabolite levels in well-trained male athletes[3].

35.     More specifically, it has been shown that alleged "nitric oxide inducing" supplements were ineffective at increasing circulating NOX levels and muscle tissue oxygenation in response to resistance exercise[4].

36.     Additionally, the provision of 12 grams/day of AAKG for seven days significantly increased plasma L-arginine levels but had no significant effect on circulating NOX or blood flow, either at rest or in response to resistance exercise[5].

_____

[2]*See* Tsai PH, Tang TK, Juang CL, Chen KW, Chi CA, Hsu MC. Effects of arginine supplementation on post-exercise metabolic responses. Chinese Journal of Physiology, 52:136-42, 2009.

[3]*See* Liu T, Wu C, Chiang C, Lo Y, Tseng H, Chang C. No effect of short-term arginine supplementation on nitric oxide production, metabolism and performance in intermittent exercise in athletes. *Journal of Nutritional Biochemistry,* 20:462-68, 2009.

[4]*See* Bloomer RJ, Williams SA, Canale RE, Farney TM, Kabir MM. Acute effect of nitric oxide supplement on blood nitrate/nitrite and hemodynamic variables in resistance trained men. *Journal of Strength and Conditioning Research*, 24:2587-92, 2010.; *see also* Bloomer R, Farney T, Trepanowski J, McCarthy C, Canale R, Schilling B. Comparison of pre-workout nitric oxide stimulating dietary supplements on skeletal muscle oxygen saturation, blood nitrate/nitrite, lipid peroxidation, and upper body exercise performance in resistance training men. *Journal of the International Society of Sport Nutrition,* 7:16-30, 2010.

[5]*See* Willoughby DS, Boucher T, Reid J, Skelton G, Clark M. Effects of 7 days of arginine-alpha-ketoglutarate supplementation on blood flow, plasma L-arginine, nitric oxide metabolites, and asymmetric dimethyl arginine after resistance exercise. *International Journal of Sport Nutrition and Exercise Metabolism,* 21:291-99, 2011.

37.     Based on this premise, hemodynamic function (heart rate and blood pressure) would increase to justify the increased blood flow, ultimately improving cardiovascular function.

38.     In a study examining the effects of acute L-arginine supplementation and resistance exercise on arterial function in young men, there was no significant change in blood flow and hemodynamic and vascular responses when 7 grams of L-arginine was given immediately before resistance exercise[6].

39.     It has been shown that single doses of alleged "nitric oxide inducing" supplements were ineffective at increasing blood flow in response to resistance exercise[7].

### B.  AAKG Effects on Strength, Muscle Growth, Endurance and Athletic Performance

40.     It has been shown that 6 grams of L-arginine delivered either intravenously or orally[8] and 12 grams/day for 7 days[9] did not result in any significant changes in blood pressure, heart rate, or cardiac output.

41.     In assessing the effects of high (5.7 grams) and low (2.8 grams) doses of L-

---

[6] *See* Fahs C, Heffernan K, Fernhall B. Hemodynamic and vascular response to resistance exercise with L-arginine. *Medicine and Science in Sports and Exercise,* 41:773-79, 2009.

[7] *See* Bloomer RJ, Williams SA, Canale RE, Farney TM, Kabir MM. Acute effect of nitric oxide supplement on blood nitrate/nitrite and hemodynamic variables in resistance trained men. *Journal of Strength and Conditioning Research,* 24:2587-92, 2010.; *see also* Bloomer R, Farney T, Trepanowski J, McCarthy C, Canale R, Schilling B. Comparison of pre-workout nitric oxide stimulating dietary supplements on skeletal muscle oxygen saturation, blood nitrate/nitrite, lipid peroxidation, and upper body exercise performance in resistance training men. *Journal of the International Society of Sport Nutrition,* 7:16-30, 2010.

[8] *See* Bode-Boger S, Boger R, Galland A, Tsikas D, Frolich J. L-arginine-induced vasodilation in healthy humans: pharmacokinetic-pharmacodynamic relationship. *British Journal of Clinical Pharmacology,* 46:489-97, 1998.

[9] *See* Willoughby DS, Boucher T, Reid J, Skelton G, Clark M. Effects of 7 days of arginine-alpha-ketoglutarate supplementation on blood flow, plasma L-arginine, nitric oxide metabolites, and asymmetric dimethyl arginine after resistance exercise. *International Journal of Sport Nutrition and Exercise Metabolism,* 21:291-99, 2011.

arginine supplementation for 4 weeks in endurance-trained male athletes, there was no improvement in physical performance as measured by run time to exhaustion[10].

42.     In addition, no improvement in the time required to run 31 km was observed after 14 days of L-arginine supplementation at a dose of 15 grams/day[11].

43.     L-arginine provided orally at 6 g/day for three days was shown to have no effect on muscular power generated during an anaerobic cycle ergometer test in well-trained male athletes[12].

44.     The provision of 3.7 grams of AAKG failed to improve muscle endurance or significantly affect the blood pressure response to anaerobic work.  In fact, the clinical participants that consumed AAKG prior to exercise had compromised endurance and strength.[13]

45.     Furthermore, eight weeks of resistance training combined with AAKG supplementation at a daily dose of 12 grams appeared to be safe and well tolerated, but had only modest improvements in muscle strength and power, and had no effects on body composition or aerobic capacity[14].

---

[10]*See* Abel T, Knechtle B, Perret C, Esser P, von Arx P, Knecht H. Influence of chronic supplementation of arginine aspartate in endurance athletes on performance and substrate metabolism - a randomized, double-blind, placebo-controlled study. *International Journal of Sports Medicine*, 26:344-49, 2005.

[11]*See* Colombani PC, Bitzi R, Frey-Rindova P, Frey W, Arnold M, Langhans W, Wrenk C. Chronic arginine aspartate supplementation in runners reduces total plasma amino acid level at rest and during a marathon run. *European Journal of Nutrition*, 38:263-70, 1999.

[12]*See* Liu T, Wu C, Chiang C, Lo Y, Tseng H, Chang C. No effect of short-term arginine supplementation on nitric oxide production, metabolism and performance in intermittent exercise in athletes. *Journal of Nutritional Biochemistry,* 20:462-68, 2009.

[13]*See* Greer BK, Jones BT. Acute arginine supplementation fails to improve muscle endurance or affect blood pressure responses to resistance training. Journal of Strength and Conditioning Research, 25:1789-94, 2011.

[14]*See* Campbell B, Roberts M, Kerksick C, Wilborn C, Marcello B, Taylor L, Nassar E,

46.     In assessing the effects of high (5.7 grams) and low (2.8 grams) doses of L-arginine supplementation for 4 weeks in endurance-trained male athletes, there was no improvement in physical performance as measured by run time to exhaustion[15].

47.     In addition, no improvement in the time required to run 31 km was observed after 14 days of L-arginine supplementation at a dose of 15 grams/day[16].

48.     AAKG supplementation, at the levels present in the Product and at the recommended doses, have been shown to be ineffective at increasing circulation of nitric oxide, causing vasodilatation and increasing blood flow, increasing muscle strength and mass, and increasing cardiovascular-based exercise performance.

49.     In sum, AAKG supplementation, even at the levels that far exceed those in the Product and at the recommended doses, have been shown to be absolutely ineffective at increasing circulation of nitric oxide, causing vasodilatation and increasing blood flow, increasing muscle strength and mass, and increasing cardiovascular-based exercise performance. Therefore, all of Defendant's claims related to AAKG are false.

## II.     Creatine Monohydrate ("CM")

50.     The Product contained CM, which has been clinically proven only at certain doses to increase strength and muscle mass when used by athletes and fitness enthusiasts during weight

---

Leutholtz B, Bowden R, Rasmussen C, Greenwood M, Kreider R. Pharmokinetics, safety, and effects on exercise performance of L-arginine alpha-ketoglutarate in trained adult men. *Nutrition,* 22:872-881, 2006.

[15]*See* Abel T, Knechtle B, Perret C, Esser P, von Arx P, Knecht H. Influence of chronic supplementation of arginine aspartate in endurance athletes on performance and substrate metabolism - a randomized, double-blind, placebo-controlled study. *International Journal of Sports Medicine*, 26:344-49, 2005.

[16]*See* Colombani PC, Bitzi R, Frey-Rindova P, Frey W, Arnold M, Langhans W, Wrenk C. Chronic arginine aspartate supplementation in runners reduces total plasma amino acid level at rest and during a marathon run. *European Journal of Nutrition*, 38:263-70, 1999.

training.

51.     Defendant's Product contains 1 gram of CM per serving. Defendant directs the consumer to "take 1 to 3 scoops prior to training or activity."

52.     The only dosing of CM that has shown to be truly effective has been a loading period, usually around 0.3 grams/kg of body mass/day (the average body weight in North America is over 81 kg), for 3 to 5 days, then a continued dosing of 3-5 grams/day[17].

53.     While CM that has been shown to be effective when taken as part of an on-going regimen with  continued dosing of upwards of 5 grams/day (after a loading period of 3 to 5 days at a lower dose), CM given at the doses in Defendant's Product actually decreased the free creatine content in muscles rather than increasing it.

54.     Only if the consumer consumed the maximum dosage suggested by the Defendant would the consumer have the slightest possibility of receiving the benefits of CM.

### III.     Beta-Alanine

55.     The Products contain Beta-Alanine (as Carnosyn®) which has been shown in clinical studies, at a dose dependent amount, to delay muscular fatigue, promote muscular endurance, and improve workout performance.

---

[17]*See* Jager, R; Harris, R.C.; Purpura, M; Francaux, M. Comparison of new forms of creatine in raising plasma creatine levels. Journal of the International Society of Sports Nutrition, 4(17), 2007; *see also* Jager, R; Purpura, M; Shao, A; Inoue, T; Kreider, R.B. Analysis of the efficacy, safety, and regulatory status of novel forms of creatine. Amino Acids, 40: 1369-1383, 2011; *see also* Clark, J.F. Creatine and Phosphocreatine: A review of their use in exercise and sport. J Athl Train, 32(1): 45-51, 1997; *see also* Graef, J.L; Smith, A.E.; Kendall, K.L.; Fukuda, D.H.; Moon, J.R.; Beck, T.W.; Cramer, J.T.; Stout, J.R. The effects of four weeks of creatine supplementation and high-intensity interval training on cardiorespiratory fitness: a randomized control trial. Journal of International Society of Sports Nutrition, 6(18), 2009; *see also* Greenhaff, P.L. The nutritional biochemistry of creatine. The Journal of Nutritional Biochemistry, 8(11): 610-618, 1997; *see also* Tarnopolsky, M.A.. Creatine as a therapeutic strategy for myopathies. Amino Acids, 40: 1397-1407, 2011.

56.     The effective dosage of the patented Beta-Alanine is 2.4 to 3.2 grams per day, as suggested by the patent-holder. (Exhibit C).

57.     Defendant's Product contains 500mg of Beta Alanine (as Carnosyn®) per serving.  The Defendant directs the consumer to "take 1 to 3 scoops prior to training or activity". (Exhibit B).  This is far less than the dosage established to offer any of the promised benefits.

### *IV.     AstraGin*™

58.     Defendant's Product contains the compound AstraGin™ which is marketed by the TM holder as a natural compound that in multiple pre-clinical studies has been shown to increase the absorption of certain nutrients, including Arginine.

59.     AstraGin's™ sole function in a formulation like that of the Product is to increase bioavailability of other active ingredients.

60.     However, as alleged in detail above, these other active ingredients do not offer the benefits claimed by Defendant.

61.     Moreover, to the extent such benefits may be dosage-dependant, these ingredients are by their own chemical nature already bioavaiable to such an extent that AstrGIn™ cannot meaningfully increase the availability of these other ingredients. Indeed, there are no scientifically reliable studies on AstraGin's effect on Creatine or Beta Alanine absorption.

62.     As with the claims based on the other ingredients, the formulation is meant merely to convey the sense that the Product is efficacious, not to deliver an efficacious Product that will meet the representations made by Defendant.

### *Defendant's Claims of the Product Providing Additive Support*

63.     Defendant makes the following claims regarding the additive support of the Product to other dietary supplements or beverages:

- **BODYBUILDING**: COMBINE TRAINING FORMULA WITH PROTEIN OR AMINO ACIDS FOR ADDED MUSCLE SUPPORT
- **FITNESS/SPORTS TRAINING**: FOR ADDED ENERGY AND RECOVERY SUPPORT, COMBINE TRAINING FORMULA WITH AMINO ACIDS AND/OR NATURAL FRUIT JUICE
- **ENDURANCE**: CAN BE TAKEN WITH ELECTROLYTES OR ADDED TO YOUR FAVORITE SPORTS BEVERAGE

64.     **BODYBUILDING:** This claim is false and misleading because although Protein and Amino Acids have been proven to aid in the strength and size of muscles, the Product does nothing to aid in this process.

65.     **FITNESS/SPORTS TRAINING:** This claim is false and misleading because although Amino Acids and the sugars contained within natural fruit juice have been proven to give energy and recovery support to the user, the Product does nothing to aid in this process.

66.     **ENDURANCE:** This claim is false and misleading because although Electrolytes and the sugars contained within sports beverages have been proven to provide endurance to the user, the Product does nothing to aid in this process.

67.     Defendant's refusal to inform the consumers that the Product provides no additive effect to the additional dietary supplements and drinks is an omission of a material fact that if known to the consumers would likely result in them not purchasing the Product.


***Defendant's Misleading Statements Regarding "Servings Per Container"***

68.     Defendant's recommended dosage is 1-3 scoops.

69.     However, under the Product's "Supplement Facts" on the label, the serving size is listed at 1 Scoop, and Servings Per Container is listed at 90.

*70.*     Defendant's claim that there are 90 servings contained in the Product is misleading because at that dosage-one scoop- the Product is completely useless.

71.     At the Product's dosing protocols it is impossible for Defendant to meet their advertising, labelling and marketing claims contained herein.

**NEW JERSEY'S SUBSTANTIVE LAW APPLIES TO THE NATIONWIDE CLASS**

72.     New Jersey's substantive laws apply to the proposed Nationwide Class, as defined herein, because Plaintiff properly brings this Complaint in this District.

73.     New Jersey's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Nationwide Class under the Due Process Clause, 14th Amend., § 1, and the Full Faith and Credit Clause, art. IV., § 1, of the U.S. Constitution.  New Jersey has significant contact, or significant aggregation of contacts, to the claims asserted by the Plaintiff and all Class members, thereby creating state interests that ensure that the choice of New Jersey state law is not arbitrary or unfair.

74.     Defendant's headquarters and principal place of business is located in New Jersey.  New Jersey has an interest in regulating Defendant's conduct under its laws.  Defendant's decision to reside in New Jersey and avail itself of New Jersey's laws renders the application of New Jersey law to the claims herein constitutionally permissible.

75.     Defendant maintains 29 of its stores in New Jersey (more per square mile than any other state) and a substantial number of members of the proposed Nationwide Class also reside in New Jersey and bought the Product in New Jersey.

76.     New Jersey is also the State from which Defendant's alleged misconduct emanated.  This conduct similarly injured and affected all Plaintiffs and Class members residing in the United States.  For instance, Defendant's marketing efforts relating to the Product were created and orchestrated from its headquarters in New Jersey.  On information and belief the formulation and any testing related to that formulation were also coordinated and/or conducted in

New Jersey.

77.     The application of New Jersey's laws to the Nationwide Class is also appropriate under New Jersey's choice of law rules because New Jersey has significant contacts to the claims in this litigation, and New Jersey has a greater interest in applying its laws here than any other interested state.

78.     In the alternative, the Court may apply the substantive law of the States where Plaintiff and each member of the Class resides and/or bought the Product.  Plaintiff reserves the right to plead such class(es).

## CLASS ACTION ALLEGATIONS

79.     Plaintiff brings this class action on behalf of himself and as a class action under Federal Rule of Civil Procedure 23 on behalf of the following class:

> All Persons in the United States who purchased the Product from Defendant from six years from the first-filed complaint in this action until the final disposition of this and any and all related cases.

Excluded from the Classes are: (a) any Judge or Magistrate presiding over this action and members of their families; (b) Defendant and any entity in which Defendant has a controlling interest or which has a controlling interest in Defendant and its legal representatives, assigns and successors of Defendant; and (c) all persons who properly execute and file a timely request for exclusion from the Classes.

Plaintiff reserves the right to denominate state subclass(es) as may be appropriate if a national class is not maintainable

80.     Numerosity:   The Class is composed of hundreds of persons who purchased the Product, the joinder of whom in one action is impractical.  Moreover, upon information and

belief, the Class is ascertainable and identifiable from Defendant's records or identifying marks on the Product.

81.     Commonality:   There are questions of law or fact common to the Classes that predominate over any questions affecting only individual members, including:

a)   Whether Defendant's packaging, advertising, marketing, promotion, and sale of the Product was and remains false, fraudulent, deceptive, misleading and unsubstantiated;

b)   Whether Defendant's actions constitute violations of the New Jersey Consumer Fraud Act;

c)   Whether Defendant has breached warranties made to the consuming public about the Product;

d)   Whether Defendant is being unjustly enriched at the expense of consumers in connection with the marketing, advertising, promotion, packaging, distribution, and sale of the Product;

e)   Whether members of the Classes have sustained damages and, if so, the proper measure thereof; and

f)   Whether Defendant should be enjoined from the continued mislabeling, marketing, advertising, promotion, distribution, and sale of the Product.

82.     Typicality:  Plaintiff's claims are typical of the claims of the members of the Class, as all such claims arise out of Defendant's conduct in designing, manufacturing, marketing, advertising, warranting and selling the Product and Defendant's conduct in concealing material facts.

83.     Adequate Representation:  Plaintiff will fairly and adequately protect the interests of the members of the Classes and has no interests antagonistic to those of the Classes.  Plaintiff

has retained counsel experienced in the prosecution of complex class actions, including but not limited to consumer class actions involving, inter alia, breach of warranties, product liability and product design defects.

84.     Predominance and Superiority:  This class action is appropriate for certification because questions of law and fact common to the members of the Class predominate over questions affecting only individual members, and a Class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Classes is impracticable.  Should individual Class members be required to bring separate actions, this Court and/or courts throughout New Jersey and the United States would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments.  In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

## ESTOPPEL FROM PLEADING THE STATUTE OF LIMITATIONS

85.     Defendant is estopped from relying on any statutes of limitation by virtue of Defendant's acts of fraudulent concealment, which include Defendant's intentional concealment from Plaintiff and the general public that their Product is useless at the recommended servings. Defendant's acts of fraudulent concealment include, but are not limited to, failing to disclose that the ingredients contained in the Product are ineffective and/or represented at lower than clinical doses.  Through such acts, Defendant was able to conceal from the public the truth concerning the Product.

86.     Plaintiff had no knowledge that the Product was ineffective and/or significantly under-dosed.

87.     Defendant had a duty to disclose that the ingredients contained in the Product were ineffective and/or heavily under-dosed.

## COUNT I -  VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT ("CFA")
## N.J. Stat. Ann. §§ 56:8-1, *et seq.*

88.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

89.     This claim is brought by Plaintiff on behalf of himself and the New Jersey and National Classes.

90.     The Consumer Fraud Act prohibits *inter alia*:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of merchandise.

N.J.S.A.56:8-2.

91.     Plaintiff, all other members of the New Jersey and National Classes, and Defendant are "persons" within the meaning of the CFA.

92.     Plaintiff and all other members of the New Jersey and National Classes are "consumers" within the meaning of the CFA.

93.     At all relevant times hereto, Defendant conducted trade and commerce in New Jersey and elsewhere within the meaning of the CFA.

94.     The CFA is, by its terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes.

95.     Defendant's misrepresentations and false, deceptive, and misleading statements with respect to the Product, as described above, constitute affirmative misrepresentations in connection with the manufacture, marketing, advertising, promotion, distribution, and sale of the Product, in violation of the Consumer Fraud Act.

96.     Defendant's false, deceptive, and misleading statements would have been material to any potential consumer's decision to purchase or use the Product.

97.     Defendant acted willfully, knowingly, intentionally, unconscionably and with reckless indifference when they committed these acts of consumer fraud.

98.     The foregoing acts, misrepresentations, omissions, and unconscionable commercial practices caused Plaintiff and other members of the Class to suffer an ascertainable loss in the form of monies paid to Defendant for the Product. Plaintiff and the Classes are entitled to recover such damages, and appropriate penalties (including treble damages), attorneys' fees, and costs of suit.

## COUNT II - BREACH OF EXPRESS WARRANTY

99.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

100.    Defendant made several different express warranties upon which Plaintiff relied in making his purchase, including the false and misleading claims contained herein.

101.    In fact, there is no competent and reliable scientific evidence that support any of Defendant's claims, and actually there is competent and reliable scientific evidence refuting those claims.

102.    The Plaintiff and Class Members received a product that did not provide muscle, endurance and/or performance support.

103.    These facts constitute breaches of all applicable express warranties as alleged in this complaint.

104.    As a result of the foregoing, Plaintiff and the members of the Class have suffered damages that were directly and proximately caused by the false and misleading representations/omissions regarding the Product.  Moreover, if Plaintiff and the members of the Classes had known the true facts about the Product, they would not have purchased the Product.

105.    Plaintiff and members of the Class have incurred damages as a consequence of Defendant's breach of warranties

## COUNT III - BREACH OF IMPLIED WARRANTY

106.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

107.    Defendant impliedly represented and warranted that the Product was free of defects, merchantable, fit for its intended purpose and fit for the ordinary purposes for which such goods are used.

108.    Upon information and belief, Defendant has sold directly, thousands of bottles of the Product in the state of New Jersey and the United States to consumers.

109.    Defendant designed, manufactured, marketed, advertised, warranted and sold the Product to Plaintiff.

110.    Defendant designed, manufactured, marketed, advertised, warranted and sold the Product to Class Members.

111.    Any limitation on the implied warranty of merchantability is unconscionable under all of the circumstances, and is unenforceable since Defendant was aware of the ineffective and/or under-dosing of the ingredients in the Product.

112.    Defendant breached the aforementioned representations and implied warranties, as the Product is ineffective and/or under-dosed.

113.    Plaintiff provided notice to Defendant of the ineffective Product and under-dosing of the ingredients.

114.    As a result of the foregoing, Plaintiff and the members of the Classes has suffered damages.  Moreover, if Plaintiff and the members of the Classes had known the true facts about the Product, they would not have had purchased the Product.

115.    Plaintiff and members of the Classes have incurred damages as a result of Defendant's breach of implied warranty.


## COUNT IV – UNJUST ENRICHMENT

116.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

117.    Defendant has profited and benefited from Plaintiff's and the other Class members' purchase of the Product.

118.    Defendant accepted payment, directly and indirectly, from Plaintiff and members of the Classes for the purchase of the Product.

119.    Defendant unjustly enriched itself at the expense of Plaintiff and the other members of the Classes, and is required, in equity and good conscience, fully to compensate them for the damages that they have suffered when the Product was no of the quality, nature, and fitness that has been represented by Defendant and which Plaintiff and the other members of the Classes reasonably expected.

120.    Under these circumstances, to allow Defendant to retain the profits and benefits it received from Plaintiff and members of the Classes would be inequitable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and all others similarly situated, prays for a judgment against Defendant as follows:

1.    For an order certifying the Classes, pursuant to Rule 23, appointing Plaintiff as representative of the Classes, and appointing the law firms representing Plaintiff as counsel for the Classes;

2.    For compensatory damages, and all other damages allowable under the law, sustained by Plaintiff and the Classes;

3.    Awarding Plaintiff and the proposed Class members their damages, trebled;

4.    Awarding restitution and disgorgement of Defendant's profits earned through the sale of the Product to Plaintiff and Class Members;

5.    For equitable and/or injunctive relief;

6.    For specific performance of its express warranty;

7.    For payment of costs of suit herein incurred;

8.    For both pre-judgment and post-judgment interest at the maximum rate allowable at law on any amounts awarded;

9.    For payment of reasonable attorneys' fees and expert fees as may be allowable under applicable law; and

10.    For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated:  May 30, 2013

BY: s/ Scott Alan George
 Scott Alan George
 **SEEGER WEISS LLP**
 550 Broad Street; Suite 920
 Newark, NJ 07102
 Tel:  (973) 639-9100
 Fax:  (973) 639-9393
 sgeorge@seegerweiss.com

 Jonathan Shub
 **SEEGER WEISS LLP**
 1515 Market Street
 Suite 1380
 Philadelphia, PA 19102
 Tel:  (215) 564-2300
 Fax: (215) 851-8029
 jshub@seegerweiss.com

 NICK SUCIU III
 (Pro Hac Vice Application Forthcoming)
 **OLIVER LAW GROUP PC**
 950 W. University Drive, Ste. 200
 Rochester, MI 48307
 Telephone: (248) 327-6556
 Facsimile: (248) 436-3385
 notifications@oliverlg.com
 www.legalactionnow.com

 ALYSON OLIVER
 (Pro Hac Vice Application Forthcoming)
 **OLIVER LAW GROUP PC**
 950 W. University Drive, Ste. 200
 Rochester, MI 48307
 Telephone: (248) 327-6556
 Facsimile: (248) 436-3385
 notifications@oliverlg.com
 www.legalactionnow.com

 *Attorneys for Plaintiff and the Proposed Class*